UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VONDA L. ANDREWS,

                Plaintiff,          Case No. 12-13111
                                         Honorable Avern Cohn
                                         Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [10, 14]**

Plaintiff Vonda L. Andrews ("Andrews") brings this action pursuant to 42 U.S.C. §405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [10, 14], which have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

**I.     RECOMMENDATION**

For the reasons set forth below, the court finds that the Administrative Law Judge ("ALJ") erred in failing to explicitly consider Andrews' physical impairments in light of the requirements of Listing 1.04A ("disorders of the spine"). As such, the ALJ's conclusion that Andrews is not disabled under the Act is not supported by substantial evidence. Accordingly, the court recommends that the Commissioner's Motion for Summary Judgment [14] be DENIED, Andrews' Motion for Summary Judgment [10] be GRANTED IN PART to the extent

it seeks remand and DENIED IN PART to the extent it seeks an award of benefits, and that, pursuant to sentence four of 42 U.S.C. §405(g), this case be REMANDED back to the ALJ for further proceedings consistent with this Recommendation.

## II.  REPORT

### A.  Procedural History

On April 26, 2010, Andrews filed an application for DIB, alleging a disability onset date of March 16, 2009.  (Tr. 124-25).  This application was denied initially on July 1, 2010.  (Tr. 69-72).  Andrews filed a timely request for an administrative hearing, which was held on June 9, 2011, before ALJ Myriam C. Fernandez Rice.  (Tr. 27-59).  Andrews, who was represented by attorney Samantha Ball, testified at the hearing, as did vocational expert ("VE") Jennifer Turecki.  (*Id.*).  On August 8, 2011, the ALJ found that Andrews was not disabled.  (Tr. 14-22).  On May 30, 2012, the Appeals Council denied review.  (Tr. 1-4).  Andrews filed for judicial review of the final decision on July 16, 2012 [1].

### B.  Background

#### 1.  Disability Reports

In an undated disability report, Andrews indicated that her ability to work is limited by degenerative disc disease, ulcerative colitis, "TMJ," cervical spondylosis, one kidney renal artery stenosis, and uncontrolled hypertension.  (Tr. 162).  Andrews reported that these conditions became severe enough to keep her from working on March 16, 2009.  (Tr. 163).  Since that time, she worked briefly, until November 7, 2009, but stopped working in that job because it was "seasonal."  (*Id.*).

Andrews completed high school but had no further education.  (*Id.*).  Prior to stopping work, Andrews worked as a housekeeper, retail salesperson, and general laborer.  (Tr. 164).  Andrews indicated that she had treated with several medical providers regarding her

impairments.  (Tr. 167-73).  At the time of the report, she was taking several medications, including Asacol and prednisone (for her ulcerative colitis); Flexiril, Norco, and Naprosyn (for pain/inflammation); and HydroDiuril, Lisinopril, and Metoprolol (for high blood pressure/water retention).  (Tr. 166).  She further reported that she had had an MRI of her arm (in 2007), a whole-body ultrasound (in 2007), multiple MRI/CT scans of her lumbar and cervical spine, and a colonoscopy (in 2007).  (Tr. 168, 170-71).

In a function report dated May 24, 2010, Andrews reported that she is homeless and is "staying where [she] can."  (Tr. 183).  When asked to describe her daily activities, Andrews indicated that she gets up, brushes her teeth and showers, feeds her cats and cleans their litter box, makes breakfast, and watches television.  (Tr. 184).  On some days, Andrews might do some light shopping, go to the doctor, or clean the house if she is able.  (*Id.*).  Her conditions interfere with her sleep:  she is in so much pain that she tosses and turns and is "up and down all night."  (*Id.*).  She has trouble getting dressed, bathing (she only takes showers because she cannot get into and out of the bathtub), caring for her hair, and shaving.  (*Id.*).  She does not need reminders to take care of personal needs or grooming, but she does need reminders to take medication.  (Tr. 185).  Andrews is able to prepare her own meals, although she now cooks only frozen meals, soups, or sandwiches (as opposed to a "full course meal"), because she is unable to stand for very long.  (*Id.*).  The only housework she does is laundry (once a week), light vacuuming, mopping, and light dusting.  (*Id.*).  She says that she needs help to do these things, but no one is available.  (*Id.*).

Andrews goes outside once a day to get the mail, and once a month to shop or go to the doctor.  (Tr. 186).  She is able to drive.  (*Id.*).  She goes shopping for groceries and medication once a week, although she has to "rest afterwards & take pain meds."  (*Id.*).  She is able to pay

bills, count change, and handle a checking and savings account.  (*Id.*).  Her hobbies include watching television (which she does for 10-12 hours per day), "cat loving and caring," and using the computer (which she does for approximately four hours per week).  (Tr. 187).  She used to attend car shows, concerts, fairs, and festivals, but can no longer do these things because of the pain she experiences when walking or standing.  (Tr. 188).  She does spend time with friends, sometimes visiting them or grocery shopping with them.  (Tr. 187).  She does not have any problems getting along with family, friends, or neighbors.  (Tr. 188).

When asked to identify functions impacted by her conditions, Andrews checked lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, and completing tasks.  (*Id.*).  She can lift only 2.5 pounds and can walk only 80-100 feet before needing to rest until the pain subsides.  (*Id.*).  She has no "attention problems" and no trouble following written or spoken instructions.  (*Id.*).  She says that she gets along "very well" with authority figures and has never been fired from a job because of problems getting along with other people.  (Tr. 189).  She does not handle stress well, but generally is able to handle changes in routine.  (*Id.*).

In an undated disability appeals report, Andrews reported that her condition had worsened since her last report.  (Tr. 194).  Specifically, Andrews says that, beginning in July of 2010:

> My back is getting worse because I cannot do anything anymore.  [E]ven the simplest task like vacuuming and dusting or anything puts me in a lot of pain and I have to quit and relax and take pain medicine.  I cannot sit or stand or walk for more than 2 or 3 minutes at a time.  [L]aying down is almost impossible.  [M]y neck locks up all the time and shoots pain all the way down my arms and I have splitting headaches all the time because of my neck and the pain and I cannot hardly move it any more from side to side or up and down.

(*Id.*).  At that time, she was limiting her driving as much as possible because the pain caused by sitting was "excruciating."  (*Id.*).  Since the time of her last report, the only new medical

4

providers she reported having seen were Dr. Edward Canfield (for high blood pressure and back/neck pain) and Dr. Sohail Jilani (who "performed disability tests"). (Tr. 195-97). She was taking the following medications: Flexiril, Norco, and Naprosyn (for pain/inflammation); and hydrochlorothiazide, Lisinopril, and Metoprolol (for high blood pressure/water retention). (Tr. 198). She did not report any side effects from these medications. (*Id.*). Since her last report, she had undergone an MRI/CT scan of her lumbar spine (in May of 2010) and her cervical spine (in July of 2010). (Tr. 199).

### 2. *Plaintiff's Testimony*

At the June 9, 2011 hearing before the ALJ, Andrews testified that she was then 48 years old. (Tr. 31). She lives alone in a mobile home. (Tr. 47). She finished the twelfth grade and had worked as a cashier, a presser, cleaning banks, and stocking shelves. (Tr. 31). In those jobs, she was primarily on her feet and was required to lift 10-50 pounds. (Tr. 31-32). In her last job, which she held for only a couple of weeks in 2010, she worked in a sugar beet factory, but could not perform the work because it involved standing for long periods of time, climbing stairs, and lifting sugar beet bags. (Tr. 32-33). Prior to that, the last time she worked full-time was in 2009, when she was cleaning banks. (Tr. 34).

Andrews testified that she suffers from several conditions, including cervical spondylosis, degenerative disc disease, renal artery stenosis, ulcerative colitis, high blood pressure, high cholesterol, hip pain, and migraines. (*Id.*). On a typical day, her pain is a 7 or 8 out of 10, going down to a 6 or 7 with medication. (Tr. 49). Her neck pain, which radiates down her right arm, is so bad that it gives her a migraine headache every other day. (Tr. 35-36). At least twice a week, she gets migraine headaches that are so bad she has to lie down for 60-90 minutes. (*Id.*). She has tried pain medication and cervical injections to alleviate the pain, but has found no relief.

(Tr. 37).  Andrews testified that Dr. Gerald Schell, a neurologist, recommended fusion surgery, but because of her financial condition and because there is no guarantee that the surgery will help, she is "not willing to take that chance right now."  (Tr. 38).

Andrews also testified that she experiences back pain, which radiates down both legs and causes numbness and tingling in her legs.  (Tr. 39).  Numerous activities aggravate her back pain, including lifting, sitting or standing for long periods of time, and walking.  (Tr. 40).  Andrews testified that she can lift only 2-3 pounds, can sit for only 15-20 minutes before she has to get up and move around,[1] can stand for only 10 minutes before she needs to sit down, and can walk only one block before needing to stop and rest.  (Tr. 40-41).

Andrews also testified that she suffers from renal artery stenosis and has only one functioning kidney.  (Tr. 43).  Andrews acknowledged, however, that this condition does not cause any symptoms that affect her, but simply limits the medications she can take.  (*Id.*).

Andrews testified that she takes two blood pressure pills, a cholesterol pill, a pain pill, a muscle relaxant, a bowel movement pill, and a water pill.  (Tr. 44).  None of these medications produce any side effects.  (*Id.*).  She has trouble sleeping for more than 15-20 minutes at a time because of the pain in her neck, and she can no longer watch much television, read, vacuum, mop, sweep, or do laundry.  (Tr. 45).  She can do a few dishes, microwave meals, use the computer for a few minutes at a time, and get dressed by herself.  (Tr. 45, 50-51).  She leaves the house only to go to doctors' appointments, and she is no longer able to go to concerts, car races, or flea markets, which she used to enjoy.  (Tr. 49-50).

### 3. *Medical Evidence*

The record contains medical evidence regarding Andrews' neck pain, back pain, hip pain,

---

[1] Andrews testified that, when driving to the hearing before the ALJ – a distance of 77 miles – she had to stop six times.  (Tr. 42).

headaches, hypertension, ulcerative colitis, and renal stenosis. Because Andrews' arguments before this court stem from the ALJ's consideration of her back and neck pain, the court will focus on those records.

In 2001, Andrews had an MRI of her lumbar spine, which showed degenerative disc disease at L4-5 with slight bulge of the annulus but no disc herniation. (Tr. 249). An MRI of Andrews' sacrum and coccyx taken on February 9, 2004, was unremarkable. (Tr. 247). Similarly, an MRI of Andrews' lumbar spine taken on October 20, 2005, showed minimal lumbar degenerative changes involving the lower two levels. (Tr. 246).

On March 21, 2006, Andrews saw Dr. Edward Canfield, D.O., her primary care physician, for hypertension and low back discomfort. (Tr. 279). She indicated at that time that she had been undergoing lumbar injections which had "really improved her back discomfort." (*Id.*). On August 29, 2006, Andrews returned to Dr. Canfield, complaining of neck pain. (Tr. 268). On examination, her cervical range of motion was diminished to all fields, and extension and flexion of her neck was painful but within normal limits. (*Id.*). She was prescribed Naprosyn and Valium, and physical therapy was recommended. (*Id.*). A September 9, 2006 MRI of her cervical spine showed mild cervical spondylosis at C5-6 with tiny focal central disc protrusion without spinal stenosis or neural foraminal narrowing. (Tr. 267). On September 19, 2006, Andrews returned to see Dr. Canfield, and he noted that she had restricted range of motion in her neck, but no numbness or tingling in her arms. (Tr. 266). At the next visit, on October 2, 2006, Dr. Canfield noted that neither physical therapy nor conservative therapy had been "particularly rewarding." (Tr. 265). For that reason, Dr. Canfield referred Andrews to Dr. Theron Grover at Great Lakes Pain Consultants. (*Id.*).

Andrews first saw Dr. Grover on October 12, 2006. (Tr. 262-63). Andrews presented

with right-sided cervical discomfort but, on examination, her cervical and lumbar spine showed good range of motion and her upper extremity strength was 5/5.  (Tr. 262).  Dr. Grover diagnosed Andrews with mild cervical spondylosis and focal central disc protrusion at C5-C6. (Tr. 263).  On October 17, 2006, Andrews returned to see Dr. Grover for a cervical epidural steroid injection, as well as a right greater occipital nerve block.  (Tr. 261).  At her next visit, on October 31, 2006, Andrews reported that she had noted 70% improvement for two weeks, and she received additional injections.  (Tr. 260).  On November 13, 2006, Andrews reported 80-90% improvement with continued injections.  (Tr. 259).

Between November of 2006 and September of 2009, there is very little evidence that Andrews sought medical treatment for back or neck pain.  It appears that, after her November 13, 2006 visit to Dr. Grover – at which she indicated she was "very encouraged" by the results of the injections she received – she did not return to see Dr. Grover for additional injections until July 31, 2007.  (Tr. 256, 259).  An x-ray of Andrews' cervical spine, taken on January 8, 2008, showed only mild degenerative disease at C5-6.  (Tr. 255).

Andrews began seeing Sherri Hernisey, P.A., at Elkton Family Medicine, sometime in 2009.  At a visit on September 1, 2009, Andrews reported that she continued to experience back pain (a 7/10 on the pain scale) and that the Norco she had been prescribed was no longer working.  (Tr. 237).  Andrews was referred back to Dr. Grover for pain management, and she saw him next on September 17, 2009.  (Tr. 237, 254).  At that time, she rated her pain as a 7 or 8 out of 10 and said that standing and walking were her most problematic activities.  (Tr. 254).  Dr. Grover noted that the "last injection in 2007 provided virtually 100% relief."  (*Id.*).  Several additional injections were administered, including a cervical epidural steroid injection, a right greater occipital nerve injection, and lumbar trigger point injections.  (*Id.*).  At the next visit, on

8

October 5, 2009, Dr. Grover noted that Andrews "did respond well to the treatments," and that the injections provided "40% relief." (Tr. 253). Andrews still rated her pain as a 5 or 6 out of 10, however, and additional injections were administered. (*Id.*).

Andrews returned to see PA Hernisey on January 4, 2010, complaining of continued neck pain. (Tr. 305). Moist heat, massage, and exercise were recommended. (*Id.*). On April 21, 2010, Andrews again saw PA Hernisey, complaining of back and neck pain that were both 10/10 on the pain scale. (Tr. 301). She was again prescribed Flexiril and Norco. (*Id.*). One week later, Andrews returned, again complaining of pain and was referred to Dr. Gerald Schell for a neurosurgical evaluation. (Tr. 299).

Between the time of this referral and her initial visit to Dr. Schell in July of 2010, Andrews continued to see Dr. Grover for pain management. On March 11, 2010, Andrews presented to Dr. Grover, complaining of pain that was 10/10 on the pain scale. (Tr. 252). She reported obtaining no relief from the last round of injections. (*Id.*). Because Andrews had not had "any substantial benefit from the epidural or occipital blocks," cervical facet injections were administered instead. (*Id.*). On May 10, 2010, Andrews returned to Dr. Grover's office, reporting that she obtained "no relief at all" from these injections. (Tr. 333). She was taking Norco and Flexeril, which took the edge off of her pain, but she still reported pain that was 10/10 on the pain scale. (*Id.*). Andrews was offered the option of a lumbar epidural steroid injection for her low back pain, but there were no further treatment options (in terms of injections) for her neck. (*Id.*). She opted to continue to try to manage her pain with medication. (*Id.*).

During this same period of time, Andrews had an x-ray taken of her lumbar spine, which was negative. (Tr. 224). On May 1, 2010, Andrews underwent an MRI of her lumbar spine, which showed circumferential disc bulge with a central annular tear at L4-L5, but no evidence of

focal disc extrusion or segmental spinal stenosis, and only minimal facet degenerative changes at the L3-4, L4-5, and L5-S1 levels. (Tr. 215).

On May 3, 2010, Andrews underwent a thirty-minute Occupational Therapy Evaluation with Roxane Osantowski. (Tr. 373-78). Ms. Osantowski opined that Andrews was unable to walk, sit, or stand "for any length of time." (Tr. 374). She concluded that Andrews could lift 2.5 pounds frequently, but could never lift five pounds. (Tr. 377). Andrews was able to walk on the treadmill for only 81 seconds before she had to stop because of pain. (*Id.*).

On July 14, 2010, Andrews saw Dr. Gerald Schell at Saginaw Valley Neurosurgery for a neurosurgical evaluation. (Tr. 343). At that visit, Andrews rated her pain as 10/10 on the pain scale, and she had decreased range of motion and spasm. (*Id.*). Dr. Schell noted, however, that Andrews walked without significant antalgia, had 5/5 strength function, and no significant focal neurologic deficit. (*Id.*). According to Dr. Schell, Andrews was a candidate for interbody discectomy and fusion at the L4-5 level. (*Id.*).

On July 23, 2010, Andrews underwent another MRI of her cervical spine. (Tr. 350-51). This time, the MRI showed right facet arthropathy at C3-4 and C4-5; mild spinal stenosis and cord impingement, severe narrowing of the right neural foramen, and moderate narrowing of the left neural foramen at C5-6; and straightening of the normal cervical lordosis. (Tr. 351).

On July 27, 2010, Andrews saw Dr. Sohail Jilani, M.D., a physical medicine and rehabilitation specialist, for a "physiatry evaluation." (Tr. 347-49). Dr. Jilani noted that he had reviewed Andrews' cervical and lumbar spine MRI results. (Tr. 346). On examination, Andrews had positive tenderness in the cervical spine, loss of normal curvature, and markedly limited range of motion in all planes, secondary to pain. (*Id.*). She also had positive tenderness and limited range of motion of the lumbar spine, but the straight leg raising test was negative on

both sides.  (Tr. 348).  There was "give away weakness in the proximal muscles of both upper lower extremities, secondary to hip pain and back pain."  (*Id.*).  Dr. Jilani recommended that Andrews follow up with Dr. Schell for her neck and back surgical evaluation; he also discussed the use of moist heat, ice packs, and Tylenol 3 for pain management.  (*Id.*).  Dr. Jilani also indicated that Andrews was unable to perform her past work, which required heaving lifting, bending, and twisting, saying that she was "applying for social security and disability … [and he] agree[d] with that."  (*Id.*).  Andrews was directed to follow up with Dr. Jilani in two months. (*Id.*).

Dr. Jilani also completed a State of Michigan Department of Human Services Medical Examination Report.  (Tr. 344-46).  In that report, Dr. Jilani indicated that he had first seen Andrews in February of 2009;[2] she suffered from lower back pain, which radiated into her hips, and constant neck pain, both of which were "progressively worsening."  (Tr. 344).  He indicated that Andrews could lift two pounds frequently and five pounds occasionally, could stand and/or walk less than two hours in an eight-hour workday, and could sit less than six hours in an eight-hour work day.  (Tr. 345).

On August 11, 2010, Dr. Schell sent a letter to Dr. Canfield, Andrews' primary care physician, indicating that Andrews suffered from severe neck pain relative to cervical disc dysplasia at the C5-6 level.  (Tr. 342).  Dr. Schell further stated:  "For the most part she does not have deficits but she certainly is miserable with pain."  (*Id.*).  Andrews saw PA Hernisey again on September 27, 2010, reporting that her pain level was 9/10.  (Tr. 361).  PA Hernisey noted cervical tenderness and decreased range of motion.  (*Id.*).

Andrews returned to see Dr. Jilani for a follow-up visit on September 28, 2010.  (Tr. 381-

---

[2] As noted above, however, there is no evidence in the record that Andrews saw Dr. Jilani prior to July of 2010.

82).  Andrews indicated that, despite Dr. Schell's recommendation that she undergo surgery, she was "trying to hold off any surgical intervention at this time."  (Tr. 381).  Again, Andrews had "markedly limited" range of motion in both her lumbar and cervical spine, and she continued to demonstrate give away weakness in the muscles of her lower extremities.  (Tr. 381-82).  Dr. Jilani recommended that Andrews continue her home exercise program, start swimming, continue using ice and heat, and take prescribed pain medications.  (Tr. 382).  He again indicated his belief that Andrews could not perform her past work and that he agreed with her decision to apply for disability benefits.  (*Id.*).

On October 4, 2010, Dr. Jilani completed a Physical Residual Functional Capacity Questionnaire, in which he characterized Andrews' prognosis as "fair to guarded."  (Tr. 363).  According to Dr. Jilani, Andrews was incapable of even "low stress" jobs because these would increase her pain.  (*Id.*).  He indicated that she could not walk even one block, could sit and/or stand for less than two hours in an eight-hour workday, and needed an option to sit/stand at will.  (Tr. 364-65).  Dr. Jilani further indicated that Andrews could lift less than ten pounds occasionally.  (Tr. 365).  She was likely to miss more than four days per month as a result of her impairments.  (Tr. 366).

Andrews had x-rays of both hips performed on October 18, 2010, which showed minimal narrowing of the left acetabular joint space superiorly, but were otherwise negative.  (Tr. 355).

PA Hernisey submitted a letter, dated May 9, 2011, in which she indicated that Andrews meets "the definition of disability as she is unable to sit or stand for longer than 15 minute periods and she is unable to lift more than 10 pounds."  (Tr. 396).  PA Hernisey also noted that all conservative measures of treatment, including medication, physical therapy, and injections, had failed, and the only option left was surgery, which held no guarantees.  (*Id.*).

12

### 4.     *Vocational Expert's Testimony*

Jennifer Turecki testified as an independent vocational expert ("VE").  (Tr. 52-56).  The VE characterized Andrews' past relevant work as a housekeeper as unskilled in nature and light exertion, her work in retail sales as semi-skilled and light, and her work as a general laborer as unskilled and medium.  (Tr. 54).  The ALJ asked the VE to imagine a claimant of Andrews' age, education, and work experience, who was able to perform sedentary work, that was limited to simple, routine, repetitive tasks; with an option to sit/stand at will (provided that the individual is not off task more than 10% of the time); with no climbing of ladders, ropes, or scaffolds; with occasional postural limitations in all other categories; with only occasional rotation, flexion, or extension of the neck; and without even moderate exposure to excessive noise, excessive vibration, moving machinery, unprotected heights, or direct sunlight.  (Tr. 54-55).  The VE testified that the hypothetical individual would not be capable of performing Andrews' past relevant work.  (Tr. 55-56).  However, the VE testified that the hypothetical individual would be capable of working in the positions of information clerk (1,900 jobs in southeastern Michigan) and surveillance system monitor (2,500 jobs).  (*Id.*).  Upon questioning by Andrews' attorney, the VE testified that if the hypothetical individual needed to miss more than four days of work per month, all competitive employment would be precluded.  (Tr. 56).

### C.     **Framework for Disability Determinations**

Under the Act, DIB are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A).  The Commissioner's regulations provide that a disability is to be

determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Commissioner of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§404.1520, 416.920); *see also Heston v. Commissioner of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps …. If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Secretary of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.    The ALJ's Findings

Following the five-step sequential analysis, the ALJ found that Andrews is not disabled under the Act.  At Step One, the ALJ found that Andrews has not engaged in substantial gainful activity since March 16, 2009, her alleged onset date.  (Tr. 16).  At Step Two, the ALJ found that Andrews has the severe impairments of degenerative disc disease, ulcerative colitis, cervical spondylosis, one kidney renal artery stenosis, uncontrolled hypertension, and headaches.  (*Id.*).

14

At Step Three, the ALJ found that Andrews' impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment.  (Tr. 17).

The ALJ then assessed Andrews' residual functional capacity ("RFC"), concluding that she is capable of performing sedentary work, with the following additional limitations:  lifting no more than ten pounds only occasionally; standing or walking approximately two hours in an eight hour work day; sitting approximately six hours in an eight hour workday; sitting and standing alternatively at will, provided she is not off task more than 10% of the workday; no climbing of ladders, ropes, or scaffolds; only occasional climbing of ramps or stairs, balancing, stooping, crouching, kneeling, and crawling; only occasional rotation, flexion, or extension of the neck; and no concentrated exposure to excessive noise, excessive vibration, use of moving machinery, or exposure to unprotected heights.  (Tr. 17-20).

At Step Four, the ALJ determined that Andrews is unable to perform her past relevant work as a housekeeper, retail salesperson, or general laborer, which ranged from unskilled to semi-skilled in nature and light to medium exertion.  (Tr. 20).  At Step Five, the ALJ concluded, based in part on the VE's testimony, that Andrews is capable of performing a significant number of jobs that exist in the national economy.  (Tr. 21).  As a result, the ALJ concluded that Andrews is not disabled under the Act.  (Tr. 21-22).

### E.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Commissioner of Soc. Sec.*,

15

402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Commissioner of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Commissioner of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).   In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499 F.3d at 512-13; *Wyatt v. Secretary of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Secretary of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record.  *See Kornecky v. Commissioner of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter

16

differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Secretary of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

    **F.**    **Analysis**

        *1.*    *The ALJ's Error at Step Three Prejudiced Andrews on the Merits*

                *a.*    *The ALJ's Failure to Specifically Evaluate Andrews' Impairments In Light Of Listing 1.04A Constitutes Legal Error*

The ALJ's entire Step Three analysis consists of the following statement: "The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments…." (Tr. 17). In her motion for summary judgment, Andrews asserts that, "The ALJ's Step 3 determination is bereft of an actual discussion, and fails specifically to identify the Listing or Listings that she considered at this step." (Doc. #10 at 15). The court finds merit to this argument.

Under the theory of presumptive disability, a claimant is eligible for benefits if she has an impairment that meets or medically equals a Listed Impairment. *See Christephore v. Commissioner of Soc. Sec.*, 2012 WL 2274328, at *6 (E.D. Mich. June 18, 2012). When considering presumptive disability at Step Three, "an ALJ must analyze the claimant's impairments in relation to the Listed Impairments and must give a reasoned explanation of his findings and conclusions in order to facilitate meaningful review." *Id.* (citing *Reynolds v. Commissioner of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011)). An ALJ's failure to sufficiently articulate his Step Three findings is error. *See M.G. v. Commissioner of Soc. Sec.*, 861 F. Supp. 2d 846, 858-59 (E.D. Mich. 2012); *Reynolds*, 424 F. App'x at 416; *Tapp v. Astrue*, 2011 WL 4565790, at *5 (E.D. Ky. Sept. 29, 2011) (discussing reversal in a series of cases where the ALJ "made only a blanket statement that the claimant did not meet or equal a Listing

17

section"). This is because under the Social Security Act:

> The Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under this subchapter. Any such decision by the Commissioner of Social Security which involves a determination of disability and which is in whole or in part unfavorable to such individual shall contain a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating the Commissioner's determination and the reason or reasons upon which it is based.

42 U.S.C. §405(b)(1).

As explained in the oft-cited Tenth Circuit opinion in *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996):

> This statutory requirement fits hand in glove with our standard of review. By congressional design, as well as by administrative due process standards, this court should not properly engage in the task of weighing evidence in cases before the Social Security Administration. Rather, we review the Secretary's decision only to determine whether [his] factual findings are supported by substantial evidence and whether [he] applied the correct legal standards.

Thus, in numerous cases similar to this one, courts have recognized that an ALJ's failure to explicitly consider whether a claimant's impairments meet or medically equal a Listed Impairment constitutes legal error. For example, in *Bolla v. Commissioner of Soc. Sec.*, 2012 WL 884820, at *6-8 (E.D. Mich. Feb. 3, 2012), the ALJ concluded at Step Two that the plaintiff had the severe impairments of multiple sclerosis and depression, but then simply stated, in conclusory fashion, that "the impairments, or combination of impairments, do not meet or medically equal the specific criteria of 1.00 Musculoskeletal Symptoms, 11.00 Neurological, 12.00 Mental Disorders." *Id.* at *6. The ALJ specifically considered the plaintiff's depression in light of Listing 12.04 (affective disorders), but did not consider any other listing – including Listing 11.09 (multiple sclerosis) – in any detail whatsoever. *Id.* In finding the ALJ's Step Three analysis insufficient under the above standards, the *Bolla* court held that the "ALJ's lack

18

of narrative deprives the federal court of its ability to act as an appellate tribunal and instead forces the court to become the finder of fact ….”  *Id.*  Consequently, the *Bolla* court determined that remand was appropriate.  *Id.* at *8.

Similarly, in *Christephore*, *supra*, the court held that the ALJ erred in failing “to evaluate (or even mention) the relevant listing” when determining medical equivalence at Step Three. *Christephore*, 2012 WL 2274328, at *5.   In that case, the ALJ concluded that the plaintiff had the severe impairment of HIV, but then failed to consider whether the plaintiff met or medically equaled Listing 14.08 (HIV infection), saying only that the plaintiff’s impairments did not meet or medically equal Listing 14.00 (Immune System Disorders).  *Id.* at *5-6.  In concluding that the ALJ erred, the court explained:

> The ALJ does not evaluate Plaintiff’s physical symptoms in relation to those described in 14.00 and does not articulate his reasons for finding that Plaintiff’s symptoms do not meet or equal those criteria.  His conclusory, one-sentence statement that Plaintiff’s impairments do not meet or medically equal the criteria of 14.00 is contrary to the requirements that ALJs explain the reasons for their decisions.

*Id.* at *6.  A similar conclusion was reached in *M.G.*, where “the ALJ did not cite, discuss, or resolve any conflicts in the evidence in concluding that [the claimant] did not meet or medically equal a Listing.  Nor did the ALJ even identify which Listing(s) [claimant’s] impairments were compared with.”  *M.G.*, 861 F. Supp. 2d at 858 (citing *Miller v. Commissioner*, 181 F. Supp. 2d 816, 820 (S.D. Ohio 2001) (“whether or not plaintiff came forward with the requisite evidence at Step 3, the ALJ was required to discuss that evidence, relative to the Listings…”)).  *See also Christephore*, 2012 WL 2274328, at *7 (“It was not Christephore’s job to point the relevant listings out to the ALJ; it was the ALJ’s job to identify and address them.”) (citing *Burnett v. Commissioner*, 220 F.3d 112, 120 n. 2 (3d Cir. 2000) (“Putting the responsibility on the ALJ to identify the relevant listed impairment(s) is consistent with the nature of social security disability

19

proceedings which are inquisitorial rather than adversarial and in which it is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits.")).

In this case, Andrews argues that the ALJ erred in failing to consider whether her cervical and lumbar spine impairments meet or medically equal Listing 1.04A for "disorders of the spine." (Doc. #10 at 14-16). The ALJ explicitly found that Andrews suffers from degenerative disc disease and cervical spondylosis. (Tr. 16). Because the ALJ concluded that Andrews suffers from these conditions, she should have considered and discussed Andrews' impairment(s) relative to Listing 1.04A. Her failure to do so constitutes legal error. *See e.g.*, *M.G.*, 861 F. Supp. 2d at 858-59; *Bolla*, 2012 WL 884820, at *6-8.

### b.    The ALJ's Error Was Not Harmless

This court will not, however, overturn an ALJ's decision if the failure to articulate Step Three findings was harmless. *See M.G.*, 861 F. Supp. 2d at 859. Such an error is harmless where "concrete factual and medical evidence is apparent in the record and shows that even if the ALJ had made the required findings, the ALJ *would have* found the claimant not disabled…." *Id.* at 861 (quoting *Juarez v. Astrue*, 2010 WL 743739, at *5-6 (E.D. Tenn. Mar. 1, 2010)) (internal quotations omitted) (emphasis in original). In short, the case law discussed in the preceding section simply describes the minimum level of articulation an ALJ must provide regarding his Step Three analysis – it does not create or impose a heightened standard. In *Staggs v. Astrue*, 2011 WL 3444014, at *3 (M.D. Tenn. Aug. 8, 2011), the court explained that the Sixth Circuit "has consistently rejected a heightened articulation standard, noting . . . that the ALJ is under no obligation to spell out 'every consideration that went into the step three determination' or 'the weight he gave each factor in his step three analysis,' or to discuss every single impairment." *Staggs*, at *3. (quoting *Bledsoe v. Barhart*, 165 F. App'x 408, 411 (6th Cir. 2006)). The *Staggs*

court further stated, "Nor is the procedure so legalistic that the requisite explanation and support must be located entirely within the section of the ALJ's decision devoted specifically to step three; the court in *Bledsoe* implicitly endorsed the practice of searching the ALJ's entire decision for statements supporting his step three analysis." *Id.* (citing *Bledsoe, supra* at 411); *see also Smith v. Commissioner of Soc. Sec.*, 2012 WL 4897364, at *6 (E.D. Mich. Sept. 14, 2012). Thus, remand is not required where the evidence makes clear that even if he "had made the required findings, [he] *would have* found the claimant not disabled," *M.G.,* 861 F.Supp.2d at 861.

Conversely, remand is appropriate in cases where the district court's review of the ALJ's decision and the record evidence leaves open the possibility that a listing is met. *See Reynolds*, 424 F. App'x at 416 ("in this case, correction of such an error is not merely a formalistic matter of procedure, for it is possible that the evidence [the plaintiff] put forth could meet this listing"); *see also May v. Astrue*, 2011 WL 3490186, at *9 (N.D. Ohio June 1, 2011).

Here, in order for Andrews to meet the criteria of Listing 1.04A, she must show that she has a disorder of the spine with:

> Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. Pt. 404, Subpt. P., App. 1, Listing 1.04A. It is well-settled that to "meet" a listing, a claimant's impairments must satisfy each and every element of the listing. *See Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify."); *Blanton v. Social Security Admin*, 118 F. App'x 3, 6 (6th Cir. 2004) ("When all the requirements for a listed impairment are not present, the Commissioner properly determines that the claimant does not meet the listing.").

Even if Andrews cannot demonstrate that she meets the criteria of Listing 1.04A, however, she can still satisfy her burden at Step Three by proving that she has an impairment (or combination of impairments) that medically equals this Listing.  To do so, she must "present medical evidence that describes how [her] impairment is equivalent to a listed impairment." *Lusk v. Commissioner of Soc. Sec.*, 106 F. App'x 405, 411 (6th Cir. 2004).  This means that Andrews must present medical findings showing symptoms or diagnoses equal in severity and duration "to *all* the criteria for the one most similar listed impairment."  *Daniels v. Commissioner of Soc. Sec.*, 70 F. App'x 868, 874 (6th Cir. 2003) (internal quotations omitted); *see also* 20 C.F.R. §404.1529(d)(3) ("In considering whether your symptoms, signs, and laboratory findings are medically equal to the symptoms, signs, and laboratory findings of a listed impairment, we will look to see whether your symptoms, signs, and laboratory findings are at least equal in severity to the listed criteria.").

In this case, there is no dispute that several of the criteria of Listing 1.04A are satisfied.  The ALJ concluded that Andrews has degenerative disc disease and cervical spondylosis.  (Tr. 16).  There is evidence of nerve root compression:  a July 23, 2010 MRI of Andrews' cervical spine showed right facet arthropathy at C3-4 and C4-5; mild spinal stenosis and cord impingement, severe narrowing of the right neural foramen, and moderate narrowing of the left neural foramen at C5-6; and straightening of the normal cervical lordosis.  (Tr. 351).  With respect to "neuro-anatomic distribution of pain," Andrews points to the results of a 2001 EMG examination, which showed evidence of radiculopathy and neuropathy.[3]  (Doc. #10 at 16) (citing

---

[3] The Commissioner argues that these EMG results are irrelevant because "the Listing expressly states that electrodiagnostic testing procedures do 'not constitute alternate criteria to the requirements of 1.04.'"  (Doc. #14 at 12) (citing 20 C.F.R. Pt. 404, Subpt. P, App'x 1, §1.00(C)(3)).  While the Commissioner may be correct that EMG results do not substitute for other Listing criteria, evidence of radiculopathy and neuropathy certainly may be considered in

Tr. 248).  She also testified at the hearing that her neck pain radiates down her right arm, and her back pain radiates down both legs.  (Tr. 35-36, 39).  There is evidence in the record of a markedly limited range of lumbar and cervical motion, a fact that the ALJ noted.  (*E.g.,* Tr. 19, 266, 268, 343, 346, 361, 381-82).  And, there is at least some evidence of muscle weakness in the upper and lower extremities.[4]  (Tr. 348, 381).

The Commissioner argues that Andrews "cannot state a plausible claim of having met the Listing, because the listing requires motor loss and either sensory or reflex loss."  (Doc. #14 at 11).  The Commissioner may be correct that, for the most part, the record contains "consistently normal motor, sensory, and reflex findings" (*Id.*), but this does not end the inquiry.  As discussed above, Andrews need not "meet" each criteria of a Listing; rather, she can satisfy her burden by presenting medical findings showing symptoms or diagnoses equal in severity and duration to the Listing criteria, i.e., showing that her impairments "medically equal" the Listing.

The regulation most applicable to this case states that a claimant may be found to medically equal a Listing if she has an impairment described in Appendix 1 but she "do[es] not exhibit one or more of the findings specified in the particular listing" or "exhibit[s] all of the findings, but one or more of the findings is not as severe as specified in the particular listing," provided that the claimant has "other findings related to [her] impairment that are at least of equal medical significance to the required criteria."  20 C.F.R. §404.1526(b)(1)(i).

The record here contains objective evidence of positive cervical spine tenderness, loss of

---

determining whether the claimant meets the requirements of Listing 1.04A.  *See Goodman v. Commissioner of Soc. Sec.*, 2013 WL 1349293, at *8 (E.D. Mich. Mar. 5, 2013); *Barbera v. Commissioner of Soc. Sec.*, 2012 WL 2458284, at *12 (E.D. Mich. June 6, 2012).

[4] The Commissioner argues that the so-called "giveaway weakness" found by Dr. Jilani "is not true motor weakness but rather the result of the examinee voluntarily giving up."  (Doc. #14 at 11).  While this argument may or may not have merit, it is the ALJ's responsibility – not this court's – to determine whether the weakness identified by Andrews' physician satisfies the underlying listing criteria.  *See Clifton*, 79 F.3d at 1009; *Bolla*, 2012 WL 884820, at *6.

curvature, radiating pain (which causes numbness and tingling in the legs), spasm, and, as noted above, *supra* at 23, a markedly limited range of lumbar and cervical motion. (Tr. 39, 266, 268, 343-44, 346-48, 361, 381-82). Neurosurgeon Dr. Gerald Schell recommended that Andrews undergo interbody discectomy and fusion at L4-5, which provides further support for the severity of Andrews' impairments. (Tr. 343). And, perhaps most importantly, despite the fact that the ALJ discussed several lumbar and cervical spine x-rays and MRIs that Andrews underwent between 2006 and 2010 (Tr. 18-19), she did not even mention – let alone discuss – the results of Andrews' most recent cervical spine MRI (from July of 2010), which showed significant pathology (including mild spinal stenosis and cord impingement and severe narrowing of the right neural foramen). (Tr. 351).

Taking all of these facts together, the court cannot conclude that the ALJ's error in failing to specifically consider Andrews' impairments in light of Listing 1.04A was harmless. Even assuming that Andrews does not "meet" all of the criteria of Listing 1.04A, she offered evidence of "other findings related to [her] impairment" which could be of equal medical significance to the required criteria." 20 C.F.R. §404.1526(b)(1)(i); *Cf.* Doc. #14 at 10 (arguing that Andrews "fails to show how she plausibly met or equaled any listing."). Regardless of how the ALJ might ultimately decide Andrews' claims, at this juncture, the court cannot say that, if the ALJ had made the required findings at Step Three, she necessarily *would have* found that Andrews did not meet or medically equal the relevant Listing.[5] And, if she does find that the evidence establishes medical equivalence, then Andrews would be presumptively entitled to benefits. *See Christephore*, 2012 WL 2274328, at *6.[6] Because the court cannot say that the ALJ's error was

---

[5] Nor is it the court's role to make such factual determinations in the first instance. *See Clifton*, 79 F.3d at 1009; *Bolla*, 2012 WL 884820, at *6.

[6] The Commissioner cites *Malone v. Commissioner of Soc. Sec.*, No. 12-3028, 2012 WL 5974463

24

harmless, remand is appropriate.  *See Reynolds*, 424 F. App'x at 416.[7]

## III.   CONCLUSION

For foregoing reasons, the court RECOMMENDS that the Commissioner's Motion for Summary Judgment [14] be DENIED, Andrews' Motion for Summary Judgment [10] be GRANTED IN PART to the extent it seeks remand, and that, pursuant to sentence four of 42 U.S.C. §405(g), this case be REMANDED back to the ALJ for further proceedings consistent with this Recommendation.

---

(6th Cir., Nov. 29 2012), arguing that it "clarifies the *Reynolds* ruling" and supports affirming the ALJ here.  However, the Sixth-Circuit's unpublished, two-page decision in *Malone* does not mention *Reynolds*, and does not appear to be an attempt to "clarify" it in any way that the court finds meaningful to its analysis of the particular facts and law discussed above.  Moreover, *Malone*, at *2, cited *Dorton v. Heckler*, 789 F.2d 363, 367 (6th Cir.1986), for the proposition that "the ALJ's findings of fact should not be disturbed unless we are persuaded that his findings are legally insufficient."  Here, for the reasons discussed above, the court is persuaded that the ALJ's findings were legally insufficient to support her Step Three findings.

[7] Andrews raises several other issues before this court, including that the ALJ allegedly erred in failing to consider the opinion of occupational therapist Roxane Osantowski, in giving only "little weight" to the opinion of Dr. Jilani, and in improperly determining her credibility.  Because this court concludes that the ALJ erred in his Step Three analysis, however, and recommends that this matter be remanded to the ALJ for a determination as to whether Andrews' impairments meet or medically equal the criteria of Listing 1.04A, it need not consider these additional issues in detail at this time.  However, it is worth mentioning two points here.  First, although an ALJ is not *required* to discuss opinions from "other sources" such as Osantowski, 20 C.F.R. §404.1513(d), Social Security Ruling 06-03p provides that the ALJ "*generally should* explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case."  *Social Security Ruling 06-03p*, 2006 WL 2329939, at *6 (Aug. 6, 2006) (emphasis added).  Second, the ALJ's overall analysis would benefit from a more thorough discussion of the reasons she discounted Dr. Jilani's opinion.  In rejecting Dr. Jilani's opinions regarding Andrews' physical limitations, the ALJ says only that the "medical record shows otherwise," apparently relying on Dr. Schell's July 2010 medical report, which stated that Andrews' "motor strength was five/five and that there was no significant focal neurologic deficit and no significant antalgia."  (Tr. 20).  However, that very same record also noted that Andrews had decreased range of motion, spasm, severe degenerative disc disease which had been "quite incapacitating and disabling," and that she was a candidate for interbody discectomy and fusion.  (Tr. 343).  On remand the ALJ should provide a more through and detailed explanation of whatever weight she ultimately gives to Dr. Jilani's opinion.

Dated: April 30, 2013 s/David R. Grand
Ann Arbor, Michigan DAVID R. GRAND
United States Magistrate Judge

## NOTICE

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. L.R. 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on April 30, 2013.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager